**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JUN 2 1 2018

BY
DEPUTY_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO. 6:18CR44 |
| | § | JRG/JDL |
| JOSEPH VALDIE KIMBLE | § | |

SEALED

### INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Indictment:

### Medicare Program

1.  The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five who are blind or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

2.  Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

3. The Medicare program includes a voluntary supplemental insurance benefit known as Part B, which is funded from insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Part B of the Medicare program covers most out-patient services, including medically necessary ambulance transportation to certain locations.

4. Basic Life Support (BLS) ambulances must be staffed by at least two persons who meet state and local requirements, and at least one of those persons must be certified at a minimum as an emergency medical technician-basic (EMT-basic) and be legally authorized to operate all lifesaving and life-sustaining equipment on board the vehicle.

5. To be covered, ambulance services must be medically necessary and reasonable. Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services. In addition, the reason for the ambulance transport must be medically necessary.

6. Nonemergency transportation by ambulance is appropriate if either: (1) the beneficiary is bed-confined, and it is documented that the beneficiary's condition is such that other methods of transportation are contraindicated; or, (2) if the beneficiary's medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required.

7. Medicare may cover repetitive, scheduled, non-emergent transportation by ambulance if (1) the medical necessity requirements described above are met and (2) the ambulance provider, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements are met. The physician's order must be dated no earlier than 60 days before the date the service is furnished. The written order is often referred to as a Physician Certification Statement (PCS).

8. In addition to the medical necessity requirements, the service must meet all other Medicare coverage and payment requirements, including requirements relating to the origin and destination of the transportation, vehicle and staff, and billing and reporting.

9. Provider enrollment in the Medicare program is voluntary. In order to become a provider authorized to bill Medicare for ambulance services, a company is required to submit a Medicare Enrollment Application to CMS via the Part B carrier. The Part B carrier contracts with Medicare to receive, evaluate, and approve or deny Medicare Enrollment Applications, as well as process and pay Medicare claims. The Medicare Benefit Policy Manual and the Medicare Claims Processing Manual contain the rules and regulations pertaining to services covered by Medicare as well as instructions regarding the proper submission of claims to Medicare for services provided to Medicare beneficiaries.

10. A secondary insurance program may pay a portion of a claim originally submitted to Medicare in the event that the beneficiary/recipient had both Medicare and

secondary insurance coverage. This portion is generally 20 percent of the Medicare allowance for the billed charge. An individual who is eligible under both Medicare and a secondary insurance program is referred to as a "dual-eligible beneficiary." A claim originally submitted to Medicare and subsequently to the secondary insurer for payment is referred to as a "crossover claim." Such claims are sent to the secondary insurer once processed by Medicare. The secondary insurer will pay its portion if Medicare originally allowed the claim. The guidelines regarding submission and payment of these claims are contained in the Medicare procedures manual.

11. Typically, an ambulance company submits one claim for each one-way transport. If the beneficiary returns the same day by way of ambulance, then the ambulance company would submit two claims for the same day. Each claim typically has two parts: the service component, e.g., a BLS-level service, and the mileage component. Among other information, claims typically contain dates of service, billed amounts, procedure codes, diagnosis codes, and modifier codes. Payment of claims is an automatic computer-based system, and, therefore, it is highly dependent on the codes submitted in the claim.

12. In the Medicare Enrollment Application, Medicare providers agree to abide by the applicable Medicare laws, regulations, and program instructions and promise not to submit false or fraudulent claims. Providers must keep appropriate documentation on file, and Medicare requires providers to retain records for a period of six years and three months.

13. All payments made by Medicare are made to a provider in the form of a United States Treasury check or a pre-arranged direct deposit into the provider's bank account.

**Medicaid Program**

14. The Texas Medical Assistance Program ("Medicaid") is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

15. The Medicaid program helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs. Individuals eligible under the Medicaid program are referred to as Medicaid "recipients."

16. The Texas Health and Human Services Commission ("HHSC") is responsible for administering the Medicaid program in the State of Texas. HHSC contracted with the National Heritage Insurance Company ("NHIC"), and its successor, the Texas Medicaid and Healthcare Partnership ("TMHP") to receive, evaluate, and approve or deny Medicaid Provider Agreements, as well as process and pay Medicaid claims.

17. Provider enrollment in the Medicaid program is voluntary. In order to become a provider authorized to bill Medicaid for ambulance services, a company is required to submit a Medicaid Provider Agreement to TMHP. If the provider meets

certain qualifications, TMHP will approve the application and issue a unique provider identification number to the provider. The Medicaid Provider Manual contains the rules and regulations pertaining to services covered by Medicaid as well as instructions regarding the proper submission of claims to Medicaid for services provided to Medicaid recipients.

18. The Medicaid program may pay a portion of a claim originally submitted to Medicare in the event that the beneficiary/recipient has both Medicare and Medicaid coverage. This portion is generally 20 percent of the Medicare allowance for the billed charge. Such claims are sent to Medicaid once processed by Medicare. Medicaid will pay its portion if Medicare originally allowed the claim.

19. In the Medicaid Provider Agreement, Medicaid providers agree to comply with all of the requirements of the Medicaid Provider Manual, as well as all state and federal laws and amendments, governing or regulating Medicaid. Medicaid requires providers to retain records for a period of five years.

20. All payments made by Medicaid are made to a provider in the form of a check or a pre-arranged direct deposit into the provider's bank account.

**Tiger EMS and Joseph Valdie Kimble**

21. Tiger EMS Inc. ("Tiger EMS") is an ambulance company headquartered in Longview, Texas.

22. Tiger EMS operates BLS-level ambulances and primarily provides non-emergency ambulance transports in East Texas.

23. According to Texas Secretary of State records, Tiger EMS was formed on June 1, 2006, with an initial address in Stafford, Texas. **Joeseph Valdie Kimble** (the "Defendant" or **Kimble**) was listed as Director of Tiger EMS.

24. Tiger EMS filed its initial Medicare enrollment application in or around June 2007, and it identified **Kimble** as President, Director, and 5% or greater owner.

25. In or around June 2009, Kimble's wife filed an application for a Medicaid provider number, and she listed herself as the 100% owner of Tiger EMS.

26. In or around 2011, the main office location of Tiger EMS changed to 6412 McCann Road, Longview, Texas 75605.

27. During the relevant periods in this indictment, Tiger EMS directly submitted claims for payment to Medicare and Medicaid. Tiger EMS submitted claims to Medicare using National Provider Identifier (NPI) 1902927437 and submitted claims to Medicaid using provider number 2020018.

28. According to Medicare and Medicaid documentation, payment for claims submitted to Medicare and Medicaid by Tiger EMS were made by electronic funds transfer to a bank account owned by Tiger EMS.

29. From January 1, 2012, through June 23, 2017, Tiger EMS billed Medicare approximately $11,293,735, and Medicare paid approximately $4,432,318 for those claims.

## COUNTS 1 – 13

Violation: 18 U.S.C. §§ 1347<br>(Health Care Fraud) and 2<br>(Aiding and Abetting)

1. The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2012, and continuing through in or around May 2018, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the Defendant, **Joseph Valdie Kimble**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and wilfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

3. It was the general purpose of the scheme and artifice for the Defendant to unlawfully obtain money from Medicare and Medicaid through misrepresentations and violations of Medicare and Medicaid rules. To this end, the Defendant would, among other things, (a) submit and cause the submission of false and fraudulent claims to Medicare and Medicaid; and (b) conceal the submission of false and fraudulent claims to Medicare and Medicaid.

## The Scheme and Artifice

4.   Tiger EMS provided ambulance services to beneficiaries residing in the Eastern District of Texas, many of whom did not meet Medicare program coverage criteria.

5.   **Kimble** owned and operated Tiger EMS from approximately June 2006 to the present.

6.   **Kimble** billed, or caused Tiger EMS to bill, Medicare and Medicaid for ambulance services, and **Kimble** maintained a bank account for the purpose of receiving and disbursing Medicare and Medicaid payments.

7.   Since 2012, **Kimble**, aided and abetted by others known and unknown to the grand jury, has carried out a scheme to defraud Medicare and Medicaid through the submission of false and fraudulent claims for nonemergency, scheduled, repetitive ambulance services that did not meet Medicare program coverage criteria.

8.   The Defendant submitted or caused Tiger EMS to submit claims for ambulance services that were not medically necessary and reasonable. The Defendant submitted or caused Tiger EMS to submit claims for ambulance services in which some other means of transportation other than an ambulance could have been used without endangering the patient's health.

9.   The Defendant submitted or caused Tiger EMS to submit claims for nonemergency, scheduled, repetitive ambulance services when he and Tiger EMS failed to obtain a written order from the beneficiary's attending physician certifying that the

Medicare program's medical necessity requirements were met before furnishing the service to the beneficiary.

10. The Defendant instructed Tiger EMS personnel on how to document the patient's condition during the ambulance transport, which was documented on what were known as "run sheets," in order to conceal the true conditions of the beneficiaries. The Defendant further instructed certain Tiger EMS personnel to omit information from run sheets.

11. The Defendant coded the run sheets, including selecting the diagnosis codes, in order to bill Medicare and Medicaid. As part of the scheme, the Defendant purposefully chose not to use the code "bed confined," which is a code often used for non-emergency, repetitive ambulance transports, in an effort to conceal his fraudulent conduct because from experience the Defendant knew that using the "bed-confined" code could raise red flags with Medicare and law enforcement. Instead, the Defendant purposefully billed other diagnosis codes to obtain payment from Medicare and Medicaid for patients who did not meet Medicare program coverage criteria.

12. For example, the Defendant instructed several Tiger EMS personnel to document "safety" on the run sheets regardless of the beneficiaries' conditions. In many instances, the Defendant would bill Medicare using a general diagnosis code related to patient safety, regardless of the actual condition of the patient, in order to obtain payment from Medicare and Medicaid. These diagnosis codes included, but were not limited to, 781.3 (lack of coordination), R278 (other lack of coordination), 293.1 (subacute delirium), and 298.8 (other and unspecified reactive psychosis).

13. Similarly, in an effort to obtain payment, the Defendant billed Medicare other diagnosis codes that did not accurately reflect the beneficiaries' conditions at the time of transport, such as V49.75 (amputation below the knee) and V49.76 (amputation above the knee).

14. However, regardless of the beneficiary's condition, if the beneficiary can travel by any other means other than an ambulance without endangering the beneficiary's health, then the ambulance service does not meet Medicare's program coverage criteria. **Kimble** and Tiger EMS personnel knew that many of the beneficiaries Tiger EMS transported routinely traveled by nursing home van or by other wheelchair accessible vehicle, which indicated that the beneficiaries could travel by a means of transportation other than an ambulance without endangering the beneficiaries' health.

15. **Kimble** submitted or caused to be submitted false and fraudulent claims to Medicare and Medicaid and represented that beneficiaries qualified for ambulance services according to Medicare and Medicaid regulations, when, in truth and in fact, they did not.

### Acts in Execution of the Scheme and Artifice

16. On or about the dates specified as to each count below, in the Eastern District of Texas, and elsewhere, the Defendant, **Joseph Valdie Kimble**, aided and abetted by others known and unknown to the grand jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and wilfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, that is, Medicare and Medicaid, and to obtain, by means of

materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of said health care benefit program, in that he submitted or caused the submission of claims to Medicare and Medicaid related to the identified beneficiaries, for approximately the identified dollar amounts, and represented that, on or about the identified dates of service, the ambulance services met Medicare program coverage criteria, when, in truth and in fact, they did not:

| Count | Medicare Beneficiary | Purported Service Date | Purported Claim Date | Type of Transport | Billed Amount | False Representation |
|---|---|---|---|---|---|---|
| 1 | M.B. | 8/7/2014 | 8/13/2014 | Skilled Nursing Facility to Dialysis | $600.00 | Service met Medicare program coverage criteria |
| 2 | M.B. | 8/7/2014 | 8/13/2014 | Dialysis to Skilled Nursing Facility | $600.00 | Service met Medicare program coverage criteria |
| 3 | M.B. | 2/24/2015 | 3/3/2015 | Skilled Nursing Facility to Dialysis | $600.00 | Service met Medicare program coverage criteria |
| 4 | M.B. | 2/24/2015 | 3/3/2015 | Dialysis to Skilled Nursing Facility | $600.00 | Service met Medicare program coverage criteria |
| 5 | S.D. | 9/20/2016 | 9/30/2016 | Dialysis to Skilled Nursing Facility | $460.00 | Service met Medicare program coverage criteria |

| Count | Medicare Beneficiary | Purported Service Date | Purported Claim Date | Type of Transport | Billed Amount | False Representation |
|---|---|---|---|---|---|---|
| 6 | G.H. | 4/27/2015 | 4/30/2015 | Skilled Nursing Facility to Dialysis | $690.00 | Service met Medicare program coverage criteria |
| 7 | G.H. | 4/27/2015 | 4/30/2015 | Dialysis to Skilled Nursing Facility | $690.00 | Service met Medicare program coverage criteria |
| 8 | A.M. | 6/25/2015 | 6/30/2015 | Skilled Nursing Facility to Dialysis | $480.00 | Service met Medicare program coverage criteria |
| 9 | A.M. | 6/25/2015 | 9/1/2015 | Dialysis to Skilled Nursing Facility | $480.00 | Service met Medicare program coverage criteria |
| 10 | T.R. | 3/22/2016 | 4/5/2016 | Skilled Nursing Facility to Dialysis | $480.00 | Service met Medicare program coverage criteria |
| 11 | T.R. | 3/22/2016 | 4/5/2016 | Dialysis to Skilled Nursing Facility | $480.00 | Service met Medicare program coverage criteria |
| 12 | T.R. | 9/20/2016 | 9/23/2016 | Dialysis to Skilled Nursing Facility | $480.00 | Service met Medicare program coverage criteria |

Indictment – Page 13

| Count | Medicare Beneficiary | Purported Service Date | Purported Claim Date | Type of Transport | Billed Amount | False Representation |
|---|---|---|---|---|---|---|
| 13 | C.S. | 9/20/2016 | 9/23/2016 | Dialysis to Skilled Nursing Facility | $480.00 | Service met Medicare program coverage criteria |

All in violation of 18 U.S.C. §§ 1347 and 2.

## COUNTS 14 – 26

Violation: 18 U.S.C. §§ 1028A
(Aggravated Identity Theft)
and 2 (Aiding and Abetting)

1. The General Allegations sections of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. On or about the dates specified as to each count below, in the Eastern District of Texas, and elsewhere, the Defendant, **Joseph Valdie Kimble**, aided and abetted by others known and unknown to the grand jury, did, without lawful authority, knowingly use means of identification of other persons, that is, beneficiaries' names and identification numbers (HICNs), during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c), that is, health care fraud, a violation of 18 U.S.C. § 1347:

| Count | Medicare Beneficiary | HICN (last four numbers) | Date of Use |
|---|---|---|---|
| 14 | M.B. | 3898 | 8/13/2014 |
| 15 | M.B. | 3898 | 8/13/2014 |
| 16 | M.B. | 3898 | 3/3/2015 |
| 17 | M.B. | 3898 | 3/3/2015 |
| 18 | S.D. | 1173 | 9/30/2016 |
| 19 | G.H. | 1638 | 4/30/2015 |
| 20 | G.H. | 1638 | 4/30/2015 |
| 21 | A.M. | 9441 | 6/30/2015 |
| 22 | A.M. | 9441 | 9/1/2015 |
| 23 | T.R. | 3525 | 4/5/2016 |
| 24 | T.R. | 3525 | 4/5/2016 |
| 25 | T.R. | 3525 | 9/23/2016 |
| 26 | C.S. | 6593 | 9/23/2016 |

All in violation of 18 U.S.C. §§ 1028A and 2.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
### Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(7)

1. The allegations contained in Counts 1 through 13 of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the Defendants have an interest.

2. Upon conviction of any violation of 18 U.S.C. § 1347, the Defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," or a conspiracy to commit such offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3. Upon conviction of any violation of 18 U.S.C. § 1347, or a conspiracy to commit such violations, the Defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

4. Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the Defendant:

   a. Cannot be located upon the exercise of due diligence;

   b. Has been transferred, or sold to, or deposited with a third party;

   c. Has been placed beyond the jurisdiction of the Court;

   d. Has been substantially diminished in value; or

   e. Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the Defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of **Joseph Valdie Kimble.**

  6. By virtue of the commission of the offenses alleged in this Indictment, any and all interest the Defendant has in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(7).

  All pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(7) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

               A TRUE BILL

               *[signature]*
               GRAND JURY FOREPERSON

               June 20, 2018
               Date

JOSEPH D. BROWN
UNITED STATES ATTORNEY

*[signature]*

KENNETH C. MCGURK
SPECIAL ASSISTANT UNITED STATES ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | No. 6:18CR |
| JOSEPH VALDIE KIMBLE | § § | |

## NOTICE OF PENALTY

### COUNTS 1 – 13

VIOLATION: Title 18, United States Code, Section 1347
Health Care Fraud

PENALTY: Imprisonment of not more than ten (10) years; the greater of a fine not to exceed $250,000, two times the gross gain to the Defendant, or two times the loss to the victim; or both such imprisonment and fine; and a term of supervised release of not more than three (3) years.

SPECIAL ASSESSMENT: $100.00 each count

### COUNTS 14 – 26

VIOLATION: Title 18, United States Code, Section 1028A
Aggravated Identity Theft

PENALTY: Imprisonment for not less than two (2) years; the greater of a fine not to exceed $250,000, two times the gross gain to the Defendant, or two times the loss to the victim; and a term of supervised release of not more than one (1) year. This sentence is to run consecutively to any other sentence imposed. A person convicted of a violation of this section shall not be placed on probation.

SPECIAL ASSESSMENT: $100.00 each count

Indictment – Page 18